

SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

FEB - 4 2010

J. T. NOBLIN, CLERK

BY_____DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

**CELLULAR SOUTH, INC.**             **PLAINTIFF**

**vs.**            Civil Action No. 3:10cv81 HTW-LRA

**MERRILL, LYNCH, PIERCE, FENNER &**          **DEFENDANTS**
**SMITH, INC. AND JOHN DOES A through J**

---

## COMPLAINT

---

Cellular South, Inc. ("Cellular South") files this complaint against Merrill, Lynch, Pierce, Fenner & Smith, Inc. ("Merrill").

### INTRODUCTION

1.      Cellular South initiates this action under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Miss. Code Ann. §§ 75-71-501 and -725. Cellular South also asserts certain common law claims. This action relates to currently illiquid auction rate securities that Cellular South purchased from Merrill at a cost of $26,034,314.38 in a series of transactions during the period beginning August 13, 2007 and ending on January, 25, 2008 (the "Purchase Period"). A schedule of those transactions is attached to this Complaint as Exhibit 1. For those auction rate securities, Merrill served as an auction dealer. The securities are now illiquid. Auction rate securities that Merrill underwrote or for which Merrill acted as an auction dealer are referred to in this complaint as "ML ARS."

2.      Auction rate securities are issued from trusts that hold other securities as assets, such as bonds or preferred stocks. The auction rate securities at issue in this case were issued from trusts that hold preferred stocks. Auction rate securities pay amounts calculated by applying

- 1 -

{00920869}

a rate, set at periodic auctions, to the par value of the security.  That rate is referred to as the "auction rate." Auction rate securities historically allowed issuers to obtain long-term financing at short-term interest rates because investors reasonably expected to be able to access their principal at each periodic auction.

3.      Before and during the Purchase Period, without investors' knowledge, Merrill engaged in a scheme, practice or course of conduct to manipulate the market for ML ARS. Through that manipulation, Merrill created the appearance that the securities traded at arm's length auctions.  In reality, the available supply of ML ARS well-exceeded the demand.

4.      As part of its scheme to manipulate the market for ML ARS, Merrill maintained a policy of placing or causing the placement of support bids in every auction for which it served as the sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer. That policy of placing support bids at every auction created the appearance of stability and liquidity in the auction market, prevented auction failures, and set the rates paid on those securities. Merrill also enlisted its purportedly independent research analysts to prop up the market for ML ARS in violation of Merrill's own internal policies. In addition, Merrill falsely described ML ARS as highly liquid investments that were appropriate for short-term investing, even though the market for ML ARS would not have existed absent Merrill's own manipulative conduct.

5.      The goal of Merrill's scheme was to allow Merrill to underwrite billions of dollars of ML ARS and to sell those securities at par value when they were worth significantly less. The scheme allowed Merrill to reap hundreds of millions of dollars in underwriting and auction dealer fees at the expense of investors who purchased ML ARS at overvalued prices.  The scheme also permitted Merrill to sell its inventory of ML ARS to investors, such as Cellular

{00920621}

South, at a time when it knew that the inventory would soon become illiquid because it could not continue its systematic policy of placing support bids at ML ARS auctions.

6.     Merrill's scheme came to light on February 13, 2008, when the auction rate securities market collapsed after Merrill and the other major auction dealers abruptly ended their policy of propping up the market. Since that date, the purported auctions previously managed by Merrill ceased operating. Merrill admitted that the auctions will not resume operations because no demand for ML ARS exists.

7.     Merrill's decision to end its market manipulation scheme left Cellular South holding millions of dollars in illiquid ML ARS.  Cellular South cannot sell those securities without suffering devastating losses.

## JURY DEMAND

8.     In accordance with Federal Rule of Civil Procedure 38(b) and Local Uniform Civil Rule 38(a), Cellular South demands a jury trial on every issue presented in this complaint that is triable of right by a jury.

## BASES FOR ALLEGATIONS

9.     Cellular South presents the allegations contained in this complaint based upon personal knowledge as to its own acts and upon the investigation by its counsel, which included, among other things, a review of: (a) public statements and marketing materials by Merrill and its affiliates, agents and employees; (b) Securities and Exchange Commission ("SEC") filings made by Merrill, its parent, and other brokerages, financial services firms, and investment companies; (c) public filings and statements in court proceedings and civil government and regulatory investigations involving the Merrill and other brokerage firms, financial services firms, and investment companies; (d) documents believed to be authentic copies of internal emails and

{00920621}

other business records obtained from public record sources; (e) securities analysts' reports, press releases, and media reports; and (f) interviews with and documents prepared by other knowledgeable individuals.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)), and Rule 10b-5, promulgated by the SEC (17 C.F.R. 240.10b-5).

11.     Venue is proper in this district under Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Merrill is found in, is an inhabitant of and transacts business in this district.

12.     In connection with the acts alleged in this complaint, Merrill, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to interstate telephone communications and facilities of a national securities exchange.

## PARTIES

13.     Plaintiff Cellular South, Inc. (previously defined as "Cellular South") is a Mississippi corporation with its principal place of business in Ridgeland, Mississippi.

14.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill") is incorporated in Delaware and maintains its principal executive offices in New York, New York. During and prior to the Purchase Period, Merrill, a wholly owned subsidiary of Merrill Lynch & Co, Inc. ("Merrill Lynch"), was registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and was a member of the New York Stock Exchange and the Financial Industry Regulatory Authority. During and prior to the Purchase Period, Merrill underwrote and served as an auction dealer for auction rate securities through its Global Markets and Investment

- 4 -

Banking business; offered investment advisory and brokerage services and sold auction rate

securities to investors through businesses including its Global Private Client ("GPC") segment;

and provided research on its and others' auction rate securities through its Global Research

segment.

15.     Defendants John Does A through D are fictitious entities or persons whose real

names and addresses are currently unknown to Cellular South.  Their real names and addresses

will be made part of this complaint at such time as they do become known to Cellular South.

These defendants' negligent, intentional and/or fraudulent conduct was a proximate cause of

Cellular South's damages.

## FACTUAL ALLEGATIONS

### AUCTION RATE SECURITIES AND THE AUCTION PROCESS.

16.     Auction rate securities are long-term or perpetual variable-rate equity or debt

instruments that pay rates set at periodic "auctions."

17.     The market for auction rate securities experienced dramatic growth since the

securities were first introduced in 1984.

18.     By February 2008, approximately $330 billion of auction rate securities were

outstanding.

19.     Prior to February 2008, auction rate securities typically traded at par value

through periodic auctions.

20.     The rates paid on auction rate securities were determined at the periodic auctions,

which were conducted as "Dutch" auctions.

- 5 -

{00920621}

21.     Auction rate securities allowed issuers to obtain long-term financing at less expensive, short-term rates. Purchasers of auction rate securities were willing to accept short-term rates because they understood that they could access their principal at each periodic auction.

22.     Auction rate securities were sold to investors by broker-dealers[1], including Merrill, who had entered into agreements to manage the auctions and accept orders for the purchase and sale of those securities, or by other designated brokerages, often referred to as "remarketing agents" or "distributing firms."

23.     In theory, before an auction took place, broker-dealers surveyed investor interest and gave guidance to potential investors, providing a range of rates within which the broker-dealers believed the auction would "clear," as described below. This conduct was referred to as "price talk."

24.     Price talk enabled broker-dealers, including Merrill, to influence the clearing rate for the auctions they managed. Among other things, if investors placed bids well above the price talk, the broker-dealers were able to and did place sufficient bids to clear the auctions at lower interest rates.

25.     According to typical auction procedures, each prospective buyer submitted a bid for a specific amount of securities and a specified minimum auction rate. Sell orders were filled beginning with bids at the lowest rate and continuing with bids at progressively higher rates, until all securities available for sale were sold. The rate bid at which the last of the securities were sold was the "clearing rate" or auction rate. The clearing rate was then applied to all of the securities.

---

[1] The terms "broker-dealer," "auction dealer" and "auction manager," as used in this complaint, are intended to be synonymous.

{00920621}

26.     Auction procedures typically provided for the following types of orders available to holders or prospective buyers of the securities:

    a.     HOLD: the holder kept the securities regardless of the clearing rate;

    b.     HOLD AT RATE: the prospective seller kept the securities only if the clearing rate was at least as much as the rate that the prospective seller specified; if the clearing rate was less than the rate specified, then the person sold his or her securities;

    c.     SELL: the prospective seller sold the securities regardless of the clearing rate; or

    d.     BUY: the prospective buyer submitted a bid to purchase securities at a specified minimum interest or dividend rate.

27.     Auctions could end in one of three ways: as a successful auction, an "all-hold" auction, or a failed auction.

28.     In a successful auction, the number of shares bid for purchase was equal to or greater than the number of shares offered for sale. All shares for sale were purchased, and the clearing rate applied to all securities sold until the next auction. If several bidders had bids at the clearing rate, and there were more bids than shares offered for sale, the shares were divided pro rata among the clearing rate bidders.

29.     As an example of a successful auction, assume an auction took place in which $1,000,000 of securities were for sale, and the auction received four bids: Bid A was for $500,000 at a minimum rate of 3.2 percent; Bid B was for $500,000 at 3.3 percent; Bid C was for $500,000 at 3.3 percent and Bid D was for $250,000 at 3.4 percent. In this example, the clearing rate would be 3.3 percent, which would be paid as interest or dividends on all securities in the

- 7 -

auction until the next auction. Bid A would be allocated $500,000, Bids B and C would receive pro-rata allocations of $250,000 each, and Bid D would not receive any allocation

30.     If all investors decided to hold and not sell their securities, then the auction was an all-hold auction. No securities changed hands, and a formula specified in the offering documents set the auction rate for all securities until the next auction

31.     The all-hold rate was generally lower than the market rate. Therefore, if no holder sold his, her, or its securities in the auction, the interest or dividend rate on all holders' securities would be reduced.

32.     An auction failed if the number of shares offered for sale exceeded the number of shares bid for purchase. If the auction failed, then none of the current shareholders could sell their shares, no matter what type of order they issued. An interest or dividend rate called the "penalty rate" or "maximum rate" (hereafter referred to as the "maximum rate"), specified in the offering documents, would then apply until the next auction.

33.     The maximum rate on an auction rate security was intended to ensure that the security remained liquid if the auction failed, by attracting new buyers or prompting the issuer to refinance. If the maximum rate was insufficient to attract liquidity in the event of an auction failure, however, the risk characteristics of an auction rate security were fundamentally altered.

34.     An auction rate security that carried a low maximum rate was dependent on the broker-dealer's intervention and "support" for the periodic auctions to ensure liquidity.  Without that support, any auction failure would render the security illiquid.

35.     Auction rate securities have no put feature guaranteeing that an investor could either sell the securities back to the broker-dealer on demand at par value or force the issuer to

- 8 -

redeem the securities if the auctions failed. Holders of auction rate securities depended on the integrity of the broker-dealers and the auctions to ensure that the securities remained liquid.

### CELLUAR SOUTH'S PURCHASES OF ML ARS

36.     Cellular South retained Sovereign Advisors, LLC ("Sovereign") to, among other duties, purchase highly liquid investments on Cellular South's behalf.

37.     James Ford, a trader for Sovereign, both before and during the Purchase Period had repeated contact with a Merrill employee named Chap Moore.  Mr. Moore was engaged in the sale of ML ARS and other securities for Merrill.  In conversations in connection with the sale of ML ARS, Mr. Moore repeatedly represented ML ARS as "very liquid" investments.

38.     Mr. Ford also viewed ML ARS as an attractive investment for Cellular South because the ML ARS yields began to rise in the weeks preceding and throughout the Purchase Period.

39.     Based on Mr. Ford's conversations with Mr. Moore and the increasing yields of the ML ARS in the weeks preceding and throughout the Purchase Period, Sovereign purchased, on Cellular South's behalf, the ML ARS at issue in this lawsuit from Merrill. Another Sovereign trader also initiated certain of the purchases.

40.     Merrill did not reveal to Cellular South or Sovereign that at the time Sovereign purchased the ML ARS for Cellular South, the liquidity of ML ARS depended exclusively on Merrill's ability to continue to purchase ML ARS at virtually every auction in order to prevent auction failures.

41.     Merrill did not reveal to Cellular South or Sovereign that Merrill knew at the time Sovereign purchased the ML ARS for Cellular South that Merrill's internal policies would soon

{00920621}

preclude any additional purchases of ML ARS by Merrill, which would, in turn, spell the end of any viable market for ML ARS.

42.     Merrill did not reveal to Cellular South or Sovereign that Merrill knew at the time Sovereign purchased the ML ARS for Cellular South that regardless of Merrill's internal policies, Merrill's growing financial weakness would soon preclude any additional purchases of ML ARS by Merrill, which would, in turn, spell the end of any viable market for ML ARS.

43.     Merrill did not reveal to Cellular South or Sovereign that at the time Sovereign purchased the ML ARS for Cellular South, Merrill's salespersons, including, on information and belief, Mr. Moore, were being provided ever increasing financial incentives to promote ML ARS over other investments.  Merrill was providing those increasingly lucrative financial incentives to its salespeople to promote ML ARS over other investments because Merrill was holding an excessively large inventory of ML ARS that it knew it must sell to unsuspecting investors like Cellular South, or Merrill would become saddled with hundreds of millions of dollars of illiquid ML ARS.

44.     Merrill did not reveal to Cellular South or Sovereign at the time Sovereign purchased the ML ARS for Cellular South that the increasing yields seen by Mr. Ford were the result of Merrill's scheme to manipulate ML ARS auction rates.  The goal of the scheme was make ML ARS more attractive to investors in order to divest Merrill of its own excessively large ML ARS inventory before it would lose its ability to continue to create the illusion of a viable ML ARS market and become saddled with hundreds of millions of dollars of illiquid ML ARS.

45.     On February 8, 2008, Merrill ceased purchasing ML ARS and allowed the ARS market to collapse. All of the ML ARS that Mr. Ford and a second trader purchased for Cellular South, and which Cellular South still held, became illiquid.

{00920621}

46.     Since that date, Cellular South has tried sell the ML ARS it purchased, but it cannot do so without suffering a significant loss.

47.     Additional facts pertaining to Merrill's misrepresentations, omissions and market manipulation are presented in the subsequent paragraphs of this complaint.

### MERRILL'S SCHEME TO DEFRAUD PURCHASERS OF ML ARS.

48.     Merrill was actively involved in the auction rate securities market before and throughout the Purchase Period. Merrill served as an underwriter for auction rate securities, as the sole auction dealer in "sole-managed" auctions (where only one auction dealer was signed up to participate), and as a lead auction dealer, co-auction dealer, or joint lead auction dealer in "multi-dealer" auctions (where multiple auction dealers were signed up to participate).

49.     During the Purchase Period, Merrill underwrote billions of dollars of auction rate securities, placing additional supply in an already saturated market. To accommodate the demands of issuers and obtain high credit ratings even as underwriting standards deteriorated over the course of the Purchase Period, ML ARS were issued with maximum rates that were capped at insufficient levels to attract liquidity in the event of an auction failure. Therefore, Merrill needed to suppress auction failures to prevent these low maximum rates from becoming widely known to auction rate securities investors.

50.     Before and throughout the Purchase Period, Merrill engaged in deceptive and manipulative tactics directed at auction rate securities investors to create the appearance of a functioning auction market in which auction rate securities traded in accordance with actual supply and demand. Merrill's manipulative conduct included: (1) maintaining a policy of intervening in every auction for which Merrill served as the sole or lead auction dealer to create the appearance of stability in the auction rate securities market, mask the inherent illiquidity of

- 11 -

ML ARS, and prevent auction failures; (2) making false and misleading statements and incomplete disclosures about the liquidity of ML ARS and Merrill's role in propping up the auction rate securities market; (3) routinely intervening in auctions to set the auction rates paid on those securities and deprive investors of the information necessary to assess the risk and volatility of ML ARS; (4) causing its purportedly independent research analysts to publish research reports extolling the benefits of investing in ML ARS in violation of Merrill's own internal policies; (5) pressuring its financial advisors and distributing firms to sell ML ARS; and (6) providing extraordinary financial incentives to financial advisors and research analysts to promote the sale of ML ARS.

  51. The scheme began to unravel when Merrill and other auction dealers allowed a discrete segment of the auction rate securities market to fail, as credit markets weakened in the summer and fall of 2007. When these auctions failed, some institutional investors began liquidating their positions in auction rate securities, and the overall deterioration credit markets led to further selling pressure from corporate and retail holders of auction rate securities. In response, Merrill expanded the range and extent of its manipulative practices in an attempt to simultaneously prop up the remainder of the auction rate securities market, conceal the liquidity characteristics of ML ARS, and protect itself from the consequences of its policy of intervening in the auctions.

>   (i) *Merrill maintained a policy of intervening in every auction for which it was the sole or lead auction dealer to create the appearance of stability and liquidity and to prevent auction failures.*

  52. Throughout the Purchase Period, Merrill used its own capital to routinely place support bids in every auction in which it served as an auction dealer. The placement of such

{00920621}

support bids was done pursuant to a tacit understanding among Merrill and the issuers of ML ARS that the auction dealer would act to prevent auction failures.

53.     Through the placement of these support bids, Merrill acquired ML ARS for its own account when the auctions otherwise would have failed due to lack of sufficient demand.

54.     Until August 2007, Merrill followed a uniform policy of placing support bids if needed to prevent auction failures in every auction for which it was sole or lead auction dealer.

55.     Between January 3, 2006 and May 27, 2008, Merrill placed support bids to prevent more than 5,800 auctions, for which Merrill was an auction dealer, from failing.

56.     Merrill was able to place support bids and prevent auctions from falling because it was aware of the other bids in the auctions and could place its own bids after the bidding deadline for other investors.

57.     Merrill did not disclose to investors (1) that it invariably placed support bids in every auction for which it was the sole or lead auction dealer during the Purchase Period to prevent auction failures, (2) that it placed such bids pursuant to a tacit agreement with the issuer that it would suppress auction failures, and (3) that the impact of its extensive and sustained interventions created the outward appearance that ML ARS were readily liquid investments and that the auction market functioned by the natural interplay of supply and demand.

58.     By intervening to prevent auction failures and set auction rates, Merrill masked the liquidity risks inherent in ML ARS. Due to the lack of transparency in the auction market, Cellular South and its agents could not discover the extent to which Merrill's interventions were needed to sustain the auction rate market and ensure that auctions continued to clear.

59.     Had Merrill not supported these auctions, or had Merrill disclosed the extent of its interventions, widespread auction failures would have alerted the public to the true risk

{00920621}

characteristics of the auction rate securities for which Merrill served as an auction dealer. Instead, Merrill's actions created a façade of liquidity, leading purchasers of auction rate securities, such as Cellular South, to believe that they could readily liquidate their investments through arm's-length sales at periodic auctions.

> *(ii) Merrill made false and misleading statements and incomplete disclosures about auction rate securities before and during the Purchase Period.*

64.     Before and throughout the Purchase Period, Merrill falsely described ML ARS and the auction rate securities market to investors, and failed to provide sufficient information to allow the investing public to understand the risks of those securities.

65.     Merrill described ML ARS as highly liquid, safe investments similar to money market funds. Merrill classified ML ARS as "Other Cash" on its investor clients' account statements, reinforcing the perception that auction rate securities were readily liquid alternatives to cash investments.

66.     Merrill acknowledged in certain written disclosures that it might intervene in auctions, but suggested that it did so only sporadically. Merrill did not disclose the extent of its interventions, the purpose of its interventions, or the impact of its interventions on the market for ML ARS and the attendant risks of acquiring ML ARS securities.

67.     Thus, before and during the Purchase Period, Merrill never disclosed that it maintained a policy of placing support bids as needed to suppress auction failures in every auction for which it served as the sole or lead auction dealer, that these support bids masked the lack of liquidity in the market, and that the auctions would fail without these support bids.

{00920621}

*(iii) Merrill Routinely Intervened in Auctions to Set the Auction Rates Paid on ML ARS.*

68.     Merrill's Auction Rate Securities Trading Desk, ("ARS Trading Desk") set the clearing rate for the auctions that would have failed but for Merrill's support bids before and throughout the Purchase Period. For each auction, the ARS Trading Desk knew all the bids that had been placed by both holders and prospective buyers of the securities. Armed with this information, the ARS Trading Desk placed buy bids at specified rates and in sufficient amounts that ensured the auction would clear at those rates.

69.     Throughout the Purchase Period, Merrill set interest rates in such a manner as to promote continued sales of auction rate securities to the public, but without letting clearing rates become or remain so high as to alienate the issuer clients on whom Merrill depended for continuing business and attendant underwriting commissions and auction dealer fees.

70.     By intervening in the auctions, Merrill set the clearing rate but also added ML ARS to its own inventory. Merrill and its distributing firms then reduced the excess inventory between auction periods by selling ML ARS at the auction rate that Merrill had established at the previous auction.

71.     For instance, in the autumn of 2007, Merrill chose to set higher clearing rates in an effort to sell more ML ARS and reduce its own inventory of those securities. Merrill contemplated increasing the clearing rates to levels near the maximum rates "to clear more product." While concluding that increasing clearing rates to a level approaching maximum rates "would be too scary," (in other words, send a disturbing signal to the market for ML ARS) the head of the ARS Trading Desk acknowledged Merrill's manipulation of interest rates, stating that "[w]e are working it higher . . . [t]he gloves are off and we are not concerned with issuer perception of our abilities and the competition. Gotta move these microwave ovens!"

- 15 -

{00920621}

72.     Because purchasers of income securities such as bonds and preferred stocks consider higher interest rates to be an indicator of risk, Merrill's interventions to manage interest rates and suppress auction failures deprived investors of objective information that they needed to evaluate the true risk characteristics of ML ARS.

73.     Thus, Merrill's conduct in rigging the clearing rates sent a false signal about the fair price and liquidity of ML ARS.

*(iv) Merrill violated its own internal policies by improperly requiring its allegedly independent research group to refrain from issuing guidance that would dissuade investors from purchasing ARS.*

74.     During and before the Purchase Period, Merrill's Policy & Procedures Manual ostensibly established a "Chinese Wall" designed to "restrict and monitor the flow of [material non-public] information between the various areas of [Merrill] such as Global Research, Sales [and] Trading," in order to "avoid the misuse of such information and the appearance of impropriety as well as to manage potential conflicts of interest."

75.     As explained in Merrill's Policy & Procedures Manual, this Chinese Wall supposedly precluded Merrill's ARS Trading Desk from sharing with the Research Department information that a reasonable investor would consider to be "important in describing whether to purchase, hold, or sell a security or other financial instrument," including information about "liquidity problems, defaults or other credit related-problems or events"; "increases or decreases in orders for the company's securities"; "unpublished research, opinions, and recommendations"; "nonpublic information about Merrill Lynch's securities, trading positions and securities products"; and "Merrill Lynch's intentions regarding its proprietary accounts, investment, trading, lending activities or financial strategies or decisions."

- 16 -

76.     In violation of these internal policies, personnel from Merrill's investment bank and ARS Trading Desk shared material non-public information about Merrill's inventory of ML ARS with Merrill's purportedly independent research analysts. Merrill used those research analysts to make positive statements about ML ARS while downplaying the associated risks. Merrill's research analysts participated in conference calls with Merrill's financial advisors to exhort them to sell ML ARS, and touted the benefits of ML ARS in several research reports written at the behest of and/or with input of the ARS Trading Desk. These research reports were designed to sustain the façade of liquidity in the market for ML ARS and to perpetuate the illusion that ML ARS traded at par through arm's-length sales.

77.     After Merrill allowed a limited number of ML ARS auctions to fail in August 2007, the ARS Trading Desk asked the Research Department to publish favorable research on ML ARS. In response to this request, analyst Martin Mauro wrote a research report, published by Merrill on August 21, 2007, entitled, "The Fixed Income Digest: Liquidity features of short-term municipal securities," which "point[ed] out some differences between the degree of liquidity and principal protection behind major types of short-term municipal market securities." The research report explained that Variable Rate Demand Obligations ("VRDOs") and Putable Floating-Rate Option Tax-Exempt Receipts ("P-FLOATS") have a "hard put" obliging the issuer to redeem the note at the demand of the investor, but that auction rate securities have "no hard put."

78.     When Frances Constable, the Managing Director in charge of Merrill's ARS Trading Desk, read the August 21, 2007 research report, she demanded that the Research Department retract the report. When Mauro refused, Constable turned to Kevin Conery and John Price, Constable's supervisor and the Head of Americas Sales Credit and Trading at Merrill, to ensure that the report would be retracted.

{00920621}

79.     Constable emphasized her concerns about the research report in an August 22, 2007 email to members of Merrill's Financial Products Group: "I HAD NOT SEEN THIS PIECE UNTIL JUST NOW AND IT MAY SINGLE HANDEDLY UNDERMINE THE AUCTION MARKET. IF YOU ARE GETTING ANY CALLS, PLEASE LET ME KNOW. I HAVE ASKED FOR AN IMMEDIATE CLARIFICATION TO BE PUBLISHED AND A RETRACTION OF THIS." (Upper-case lettering as in original.)

80.     The Research Department agreed to retract the report the following day.

81.     On August 23, 2007, Merrill published a replacement report, also written by Mauro, entitled "The Fixed Income Digest: Liquidity features of money market fund alternatives," that downplayed the risks of auction rate securities, while describing "the recent rise in yields on these instruments as being a buying opportunity for investors who are looking for short-term securities,"

82.     The retraction worked. After the close of business on August 23, 2007, Constable described the favorable impact of Mauro's revised research report on the market for ML ARS:

> Better tone to our market today on the heels of superb sales efforts from some of our IAD stalwarts and investors, in general, feeling confident enough to dip their toes back into our market. Incessant conference calls with GPC office complexes, sales teams and their accounts are beginning to pay off. Revised research from Marty Mauro promoting short term alternatives to money market funds and the liquidity features of auction and other municipal products, in conjunction with Kevin Conery's research of last week have been essential tools in our sales aresenal [sic].

83.     The ARS Trading Desk continued to pressure Merrill's Research Department to publish positive research reports on ML ARS in the fall of 2007 and early 2008.

84.     In response to a request from Constable for another positive research report on ML ARS, on December 6, 2007, Merrill published a research report written by Conery and

{00920621}

Mauro entitled, "Fixed Income Digest Special Edition: Enduring value in auction securities." The report explained that "the auction preferred market offers excellent value for investors looking for short-term instruments or money market alternatives"; that "individual investors are largely shielded" from problems facing the financial markets; that closed end fund preferred auction rate securities were "a conservative's conservative auction security"; that "[c]redit fears" were "largely misplaced in [the] auction market"; that "the worries of a failed auction are misplaced: failed auctions are extremely rare, and investors may have an exaggerated view of their consequences"; that "[i]n the unlikely event of a failed auction . . . [t]he investor who is willing to wait for a subsequent auction to clear may be able to eventually receive par value back"; that the "main risk" 'for investors in ML ARS was "lower rates"; and that "auction securities still make sense for investors who need ready access to their funds." Conery and Mauro knew, or reasonably should have known, that each of the foregoing statements concerning auction rate securities was literally false and misleading at the time.

85.    In promoting ML ARS, Conery and other Merrill research analysts obtained improper access to material non-public information about Merrill's inventory and sales techniques for ML ARS in contravention of the "Chinese Wall" Merrill had purportedly erected between its Research Department and sales and trading groups.

86.    Conery's own work notebooks confirm that he communicated frequently with Price and Constable between at least July 2007 and the February 2008 collapse of the auction rate securities market.

87.    In violation of the "Chinese Wall," Price and Constable informed Conery about the extent of Merrill's inventory of ML ARS, Merrill's specific plans to reduce its inventory,

{00920621}

Merrill's need to increase interest rates to counteract the lack of liquidity, and the financial incentives that Merrill provided to its financial advisors for selling ML ARS.

88.    Conery had access to Merrill's "axe sheets" or daily sales listings, which contained material non-public information about Merrill's inventory of ML ARS and its incentives for selling those securities. Conery also had frequent and unsupervised contact with personnel at Merrill's ARS Trading Desk.

89.    Conery and others at Merrill's Research Department used this material non-public information to make false and misleading statements about ML ARS in their research reports, while downplaying or avoiding frank discussions of the risks associated with those securities. Merrill executives knew that Merrill's financial advisors and distributing firms would use the information in those research reports and conference calls to sell ML ARS.

> *(v) Merrill pressured its financial advisors and distributing firms to*
> *sell ML ARS to unsuspecting investors, such as Cellular South.*

81.    When Merrill intervened to support an otherwise failing auction, it increased the amount of ML ARS in its proprietary account, pressing against the ceiling for ML ARS holdings set internally by Merrill's risk management policies. Those policies allowed Merrill to hold not more than a specified amount of ML ARS at any given time. As a result, Merrill was under constant pressure to reduce its inventory of ML ARS.

82.    Merrill engaged in concerted efforts to limit its increased exposure to ML ARS on its own balance sheet, which Constable referred to as "inventory creep." Those efforts included pressuring its financial advisors and distributing firms to "encourage greater retail participation and the attraction of new buyers in [the ML ARS] market," through conference calls and other means.

83.     As Constable explained in an email dated August 15, 2007, the conference calls

succeeded in prompting Merrill's financial advisors to sell ML ARS - "Noteworthy: Didn't hear

any failed auctions today. WHEW!! Retail sales force comforted with my brief call on GPC

National sales call at noon and in depth discussion and Q&A conference call on the auction

markets . . . ."

84.     During a conference call on August 15, 2007, Conery encouraged Merrill's

financial advisors to view auction rate securities as a selling opportunity. Constable directly

influenced analyst Conery's statements during the August 15, 2007 conference call. When one

financial advisor asked Conery a question that Constable did not like, she sent Conery a real-time

electronic message ordering him to "Shut this guy down. Suggest he call outside this call. He is

focusing attention away from your positive message."

85.     Merrill used additional means to pressure its financial advisors. In a November

30, 2007 email entitled "Money Market Opportunities," Thomas Murray, Merrill's Director of

Municipal Marketing, directed several analysts and other managers to "keep Muni Money

Market and Auction products front and center in your conversations with all [financial

advisors]."

86.     Murray also proposed that Municipal Marketing, the ARS Trading Desk, and the

Research Department collectively host a national sales conference call to encourage Merrill's

financial advisors to sell more ML ARS. Constable responded:

> I just dislocated my shoulder raising my arm to volunteer!!! . . . We had
> such a national call back in August with Marty [Mauro] and Mona
> [Payton] at the onset of the "crisis" and it was backed up with fresh
> research and was well received. We saw almost instantaneous
> improvement in our trading levels and a commensurate reduction in
> inventory. It is critical for the sales force to know that management is

{00920621}

behind these products as they represent the best products for bringing new cash into the firm.

87.     On December 12, 2007, Constable, Murray, and analysts Conery and Mauro, among others, participated in a national sales conference call with Merrill's financial advisors to convince them to sell ML ARS. During the call Murray said, "[T]here are some opportunities that grow out of what have been some severe dislocations really since August and magnified by year end pressures." Murray continued, "[T]here's a real opportunity here [to sell ML ARS]. Nothing is being suggested with the idea of a fire-sale-type approach. The idea is because it's good for the customer."

88.     In describing "a couple of specific opportunities in the auction area," Constable said the following during the December 12, 2007 conference call: "I just want to . . . reassure everyone that we are working in concert with research to provide the best ideas and to give assurance as to the solidity and ongoing endurance of some terrific markets." Constable explained that a slide presentation about ML ARS provided to all participants on the conference call should "give you some background and should help you present to your sales force in the offices there of why these should be considered a great cash management gathering tool." Constable further said, "We have research supporting our recommendations and the value of this marketplace, so you should feel very confident that this is a great place to put your investors at this time."

89.     During the December 12, 2007 conference call, analyst Conery told Merrill's financial advisors that pressure on the auction rate securities market since August 2007 had "made things that were already attractive even more attractive." Conery reiterated that Merrill's

{00920621}

Research Group endorsed auction rate securities issued by closed-end preferred funds as "the conservative's conservative investment in the auction market."

90.     None of the speakers in the December 12, 2007 conference call explained that auctions for ML ARS would fail en masse if Merrill ceased supporting the market for ML ARS, that investors' ML ARS holdings would become illiquid as a result of auction failures, that Merrill was under continued pressure to reduce its inventory of ML ARS, that Merrill was contemplating withdrawing from the auction rate securities market altogether to limit its exposure to ML ARS, and that Merrill believed that anticipated failures by other auction managers could cause a "run" on the market for ML ARS and result in the collapse of that market.

> *(vi) As part of its scheme to manipulate the auction rate securities market, Merrill provided extraordinary incentives to its financial advisors and research analysts for promoting sales of ML ARS.*

91.     Merrill provided extraordinary financial incentives for its personnel to promote sales of ML ARS. Merrill paid its financial advisors as much as 12.5 basis points on an annualized basis for the aggregate amount of ML ARS they sold to investors.

92.     By comparison, the financial advisors would not have earned any commissions, or would have earned much smaller commissions, had they sold money market funds to their clients. The revenue sharing paid by Merrill to its financial advisors provided a disproportionate incentive for those financial advisors to sell ML ARS in relation to other cash management products available to them.

93.     As the auction rate securities market tightened in the second half of 2007, Merrill offered further incentives to its financial advisors to sell ML ARS by providing "enhanced

- 23 -

production credits" of up to 100 basis points for the aggregate amount of ML ARS the financial advisors first sold at auction to their investor clients.

94.      Merrill adjusted the amount that it paid in enhanced production credits based on the size of its ML ARS inventory and the urgency of its need to remove those securities from its balance sheet. For instance, a November 21, 2007 email from Constable confirmed that Merrill would offer 25 basis points in enhanced production credits to financial advisors for selling ML ARS to counteract Merrill's "significant growth in inventory today."

95.      Merrill executives recognized the enhanced production credits were improper and debated in the fall of 2007 whether to continue providing such enhanced production credits to financial advisors for the sale of ML ARS. Constable wrote in a September 27, 2007 email that she believed discontinuing or limiting enhanced production credits would be the "death knell" for Merrill's auction rate securities business.

96.      Merrill continued to provide enhanced production credits — which, according to Constable, were "adjusted as we saw fit" — to reward financial advisors for selling ML ARS until the end of the Purchase Period.

*(vii) Merrill's decision to withdraw from the auction rate securities market left investors, such as Cellular South, holding illiquid securities.*

99.      As noted above, when the credit market deteriorated in the summer of 2007, Merrill and several other major auction dealers, including UBS, Lehman Brothers, and Deutsche Bank, chose not to intervene to prevent failures of auctions for CDO auction rate securities and certain auction rate preferred securities.

100.     Many of the CDO auction rate securities consisted of collateralized residential mortgage-backed securities that were secured by income streams from sub-prime mortgages. By

- 24 -

the summer of 2007,  the Merrill and Merrill Lynch recognized that the sub-prime mortgage market was collapsing. Merrill Lynch's exposure to that market was substantial. On October 5, 2007, Merrill Lynch announced that, for the third quarter of 2007, it would take a write-down of $5.5 billion, approximately $4.5 billion of which related to its exposure to sub-prime mortgages.

101.    Under pressure from Merrill Lynch to limit its exposure to sub-prime mortgages, Merrill elected not to support the auctions for certain CDO auction rate securities beginning in August and September 2007. Merrill declined to place support bids in auctions for at least 34 ML ARS issues, allowing those auctions to fail. Merrill also refused to place support bids in subsequent auctions for those ML ARS, causing more than $2.6 billion of those securities to remain illiquid.

102.    Institutional investors began to sell down their auction rate securities holdings beginning with the initial wave of auction failures in August 2007. As a result, Merrill intensified its efforts to prop up the remainder of the auction rate securities market.

103.    Merrill continued to monitor the industry for auction failures by other auction dealers throughout the fall of 2007 and into early 2008. Merrill and other auction dealers continued to support the market until they collectively abandoned the auction rate securities market in February 2008.

104.    According to Constable's testimony before the Commonwealth of Massachusetts, once Merrill learned that two other large auction dealers allowed their auctions to fail on February 12, 2008, it was a "fait accompli" that the entire auction rate securities market would collapse. As a result, on February 12, 2008, Merrill executives decided that Merrill would no longer support the auctions for ML ARS.

{00920621}

105.     On February 13, 2008, Merrill and all other major auction dealers of auction rate securities withdrew their support for auction rate securities market. As a result, 87%, of all auctions of auction rate securities failed.

106.     At no time before February 13, 2008 did Merrill notify investors or publicly announce that it intended to withdraw its support for the ML ARS market.

107.     As a result of the withdrawal of support by Merrill for ML ARS market, the ML ARS market has permanently collapsed, rendering all outstanding ML ARS illiquid.

### MERRILL ACTED WITH SCIENTER.

#### (i) The ML ARS were lucrative for Merrill.

108.     As one of the largest underwriters and auction dealers of auction rate securities, Merrill earned substantial fees for its services from the issuers of those securities.

109.     To compensate Merrill for its underwriting services, issuers typically paid Merrill one percent (1%) of the face value of the securities underwritten.

110.     According to an investigation by the Commonwealth of Massachusetts, between 2001 and 2008, Merrill underwrote approximately $13 billion of auction rate preferred securities and earned approximately $130 million in underwriting fees on those securities alone.

111.     Pursuant to agreements with the issuers, Merrill generally served as an auction dealer for the auction rate securities it had underwritten and was paid an annualized auction dealer fee for managing auctions.

112.     Issuers typically paid Merrill auction dealer fees of 25 basis points per year on the amount of auction rate securities for which Merrill acted as an auction dealer.

{00920621}

113.    Merrill acted as an auction dealer for approximately $24.63 billion in auction rate preferred securities. Merrill's annual auction dealer fees are estimated to exceed $61 million for those securities alone.

*(ii) Merrill seized the opportunity to manipulate the market for ML ARS.*

115.    Unlike fixed-rate bonds, commercial paper, or money market funds, auction rate securities are designed with the understanding that the holder will actively "trade" the securities by monitoring the rates of return paid on auction rate securities in relation to other short-term investment options available to the holder, and "roll at rate" (an instruction to sell unless the rate paid on the security is equal to or greater than a specified rate of interest) or sell the security outright if the rate the holder anticipates receiving on the auction rate security is inferior to other alternatives.

116.    Before an auction took place, Merrill surveyed investor interest and provided guidance, known as "price talk," to potential investors about the range of rates within which Merrill expected the auction would clear. Merrill controlled the "price talk" for ML ARS auctions. If investors placed bids well above the price talk, however, Merrill was able to and did place sufficient bids to clear the auctions at lower interest rates.

117.    As a result of insufficient investor participation in the auctions, Merrill was able to and did assert control over the clearing rates and the success or failure of the auctions.

118.    As an auction dealer, Merrill exercised near complete control over information associated with auctions. Merrill knew the number of bidders at an auction, the individual and aggregate dollar amount of bids, the range of bid prices, whether there were sufficient bids by investors for the auction to succeed, and the clearing rates in successful auctions before those

- 27 -

rates were disclosed to the issuer and investors. Merrill also knew whether it submitted bids at an auction and whether those bids were necessary for the auction's success.

119.    As an auction dealer, Merrill knew that the number of buyers for ML ARS was becoming increasingly saturated and that adverse trends in the credit markets or unfavorable news about ML ARS would result in an increase in the imbalance between sellers and buyers of ML ARS. Because of this imbalance, Merrill knew that its auctions would have failed without Merrill 's intervention and other manipulative acts.

120.    Merrill took advantage of the opportunity to manipulate the auctions for ML ARS and ensured that investors lacked sufficient information to determine that those auctions cleared only because of Merrill's interventions.

> *(iii) Merrill knew that the maximum rates of ML ARS would not*
> *ensure liquidity if an auction failed.*

122.    Merrill knew that retail investors would purchase ML ARS only if those securities were highly rated by credit rating agencies such as Fitch Ratings, Moody's Investor Service, and Standard & Poor's.

123.    As an underwriter, Merrill understood that it could obtain AAA ratings for the auction rate securities it underwrote only if those securities carried low maximum rates, as the higher the rate, the riskier the securities would be deemed to be by the rating agencies. In general, Merrill served as an auction dealer for the auction rate securities that it underwrote.

124.    During and before the Purchase Period, Merrill underwrote billions of dollars in auction rate securities with maximum rates that were insufficient to ensure the liquidity of those securities in the event of a failed auction.

{00920621}

125.    Approximately 92 percent of the auction rate securities that Merrill underwrote received AAA ratings. Merrill touted AAA ratings as a selling point.

126.    Constable acknowledged the importance of AAA ratings to Merrill's perpetuation of the market for ML ARS, stating in an email dated August 17, 2007 that Merrill was, "Drumming up [the] rating agency report machine in support of the industry."

127.    In testimony before the Commonwealth of Massachusetts, a witness Merrill designated to testify as to its underwriting practices could not identify a single instance in which Merrill refused to underwrite auction rate preferred securities based on an insufficient maximum rate.

128.    Although Merrill obtained AAA ratings to provide the appearance of quality and safety of principal, Merrill knew that those ratings actually reflected the limited liquidity of ML ARS in the form of low maximum rates.

*(iv) Merrill's manipulation of the market was designed to
limit its own exposure to ML ARS.*

129.    Internal documents show that Merrill engaged in manipulative conduct to sell ML ARS in order to reduce its own inventory of those securities.

130.    Recognizing the risk of holding ML ARS until maturity (or, in some cases, perpetuity), Merrill imposed a ceiling on the amount of ML ARS that Merrill could hold in its own inventory. As Merrill's inventory increased after institutional investors began selling down their holdings in the second half of 2007, Merrill came under increasing pressure to reduce its ML ARS holdings.

{00920621}

131.    In an email dated September 27, 2007, Constable explained that "[w]e are shoveling as fast as we can" to reduce Merrill's inventory of ML ARS, which was rapidly approaching the internally set $1 billion ceiling.

132.    With Merrill's inventory of ML ARS exceeding $2.3 billion on November 19, 2007, Price directed Constable "to get smaller unfortunately — using any means possible," including discounts and increased commissions to financial advisors who sold ML ARS. Price concluded, "Keep up the outstanding efforts."

133.    On December 19, 2007, Price described the increased inventory of ML ARS in an email to executive management at Merrill's Fixed Income Currency and Commodities Group and Merrill's Market Risk Management Group, as follows: "Please be aware that the contagion that has engulfed all has been especially harsh on the AMPS [auction market preferred stock] product. Previously it was a business that used very little Balance Sheet with a high ROA . . . . Inventory higher today. Fighting hard to get it down, Munis $1.3 bln[,] AMPS $1.8 bln."

134.    Merrill came under additional pressure to reduce inventory in the fall of 2007, as lenders that had provided financing for Merrill's inventory of ML ARS stopped accepting those securities as loan collateral. Lenders recognized that Merrill had amassed an excess inventory of ML ARS by supporting auctions for which no other buyers existed, and those securities could not be sold at par if Merrill needed to liquidate its portfolio. As a result, the liquidity of ML ARS purchased by investors became even more dependent on the Merrill's own financial condition and willingness to continue propping up the ML ARS market.

*(v) Merrill knew that the market for ML ARS was not sustainable.*

135.    Notwithstanding Merrill's efforts to manipulate and sustain the auction rate securities market, by the fall of 2007, Merrill executives knew that the market was unsustainable.

- 30 -

136.    Constable recognized that there was insufficient demand for the ML ARS already on the market and opposed taking on the role of auction dealer for further auction rate securities, stating in an email dated November 6, 2007, that "[n]onchalantly waving in additional supply seems cavalier at best."

137.    Her supervisor, John Price, was more emphatic about the condition of the auction rate securities market when he wrote in an email dated November 19, 2007: "Market is collapsing. No more $2k dinners at CRU!! The Financials are being invicerated! [sic] More firings over at Citi . . . Inventory flooding the street. Going to be a great '08 Trading environment. All we have to do is live!!"

138.    Merrill discussed the possibility of withdrawing support for all future auctions in a confidential document dated January 8, 2008, prepared by Ming Lee and John Lambert of Merrill's Global Risk Management Group and entitled, "Auction Market Preferred Stock (AMPS) — Business Risk Review." The document identified certain "Options to Reduce the Risk" as follows:

- **Option #3**: Fail future auctions
- √   Pros: ML balance sheet will be capped at levels today.
- √   Cons: ML cannot fail our own paper and may be forced to take that back.

- **Option #4**: Sell wherever market allows in conjunction with Option 3
- √   Pros: ML can sell the securities to market at discounted prices.
- √   Cons: Unless we are prepared to fail, inventory may come back at next re-auction without continued discounts.

139.    Around the same time, Merrill anticipated that firms that insured certain ML ARS would be downgraded.  That downgrade would prompt investors to sell those securities. In an email dated January 9, 2008, Jim Brewer, a senior trader at the ARS Trading Desk, explained that the auction rate securities market would collapse following these downgrades: "We

{00920621}

anticipate that if that happens there will be a wave of selling in these issues that we will be unable to support causing the auctions to fail. If any of these issues fail one can make the assumption that it will spread to the other sectors of our market regardless of the insurer or ratings."

140.    In an email dated January 23, 2008, Brewer explained to one of his colleagues, "in my opinion, we have to let [one of Merrill's issuer clients] . . . know that we feel the auction market is going to get worse not better and they would be best served [by] exiting the market."

141.    Merrill did not disclose its internal discussions over its withdrawal of support for ML ARS or the weakening and possible collapse of the auction rate securities market. Instead, Merrill continued to encourage its financial advisors and distributing firms to sell ML ARS through the first half of February 2008.

142.    As Constable explained to several trading colleagues in an email dated January 18, 2008, "[W]e are about to get shellacked from terrified investors and we HAVE TO SELL INVENTORY." (emphasis in original).

143.    Beginning in January 2008, auction dealers Lehman Brothers, Piper Jaffray, Stifel Nicolaus, and Goldman Sachs allowed their auctions to fail. Merrill knew that the auction failures were cause for alarm. In an email dated January 23, 2008, Conery called the auction failures a "new crisis" and wrote, "We've had 3 parties confirm that Lehman is dropping out of the auction business. Nothing like adding further illiquidity to an already illiquid market."

144.    Constable recognized that failures by other auction dealers would make Merrill's efforts to unload its own inventory of ML ARS even more difficult. On January 29, 2008, she sent a copy of a negative story about a recent auction failure to Price with the following note:

{00920621}

**"It['']s like the Sorcerer's Apprentice... can[']t someone make these people stop bucketing us with water. . . ."** (emphasis added).

145.    Despite these auction failures, Merrill told its financial advisors, distributing firms, and investor clients, directly and through several published reports between January 28, 2008 and February 8, 2008, that: Merrill had no intention of allowing its auctions to fail; Merrill did "not believe this failed auction is cause for alarm"; auction rate securities continued to be "the best value" for "funds that investors need to keep liquid"; Merrill considered ML ARS to be "the conservative's conservative security"; failed auctions were "an aberration" for which Merrill did not expect to see multiple recurrences"; "there has been no official confirmation" of auction dealers exiting the auction rate securities market; and that rumors of auction dealers exiting the market were not "a sign of something more ominous to come,"

146.    Similarly, in a February 7, 2008 conference call with Merrill's financial advisors, Conery disputed the possibility that all closed-end funds auctions were likely to fail, saying:

> I will tell you Merrill Lynch, certainly by all indications, is committed to this product. I would have to let the [auction] desk people speak for themselves, but given the fact that through all this turmoil they continue to plod away, I think that shows that the firm is committed to it.

> * * *

> [I]s it an area we think represents a good, conservative, reasonable investment? Yes, it is. We are quite comfortable with buying Aaa one week closed-end paper. We are quite comfortable buying Aaa one month closed-end fund paper, whether it is taxable or tax exempt we feel pretty good about it.

> * * *

> I don't think this [recent closed-end fund auction failure] is any sort of contagion market-wide disaster scenario.

{00920621}

147.     These statements by Merrill's research analysts, made at the same time that Merrill knew the ARS market was on the verge of collapse, demonstrate Merrill's intent to manipulate the market by continuing to convince investors of the safety and liquidity of ML ARS.

*(vi) Merrill's internal discussions concerning the possibility of a "run on the market" demonstrate its intent to manipulate or deceive.*

148.     Merrill knew that the continued viability of the ML ARS market depended upon its own conduct as well as that of the other auction dealers. Merrill and other auction dealers knew that if one auction dealer permitted widespread auction failures, a "run on the bank" would ensue, with panic selling by investors.  Such an event would force the auction dealers to choose between (a) attempting to sustain the auction rate securities market by buying all securities offered at auction and (b) allowing the auctions to fail en masse.

149.     As a result, Merrill and other auction dealers had a common interest in suppressing auction failures. In furtherance of their common interests, and with a tacit or express understanding that other auction dealers would similarly act to suppress auction failures, Merrill (1) continued to intervene to prevent auction failures even after the ultimate demise of the auction rate securities market was widely anticipated by decision-makers at Merrill, (2) monitored the actions of its competitors to determine if other auction dealers appeared likely to withdraw their support for the auctions, and (3) communicated directly with competitors in an attempt to determine the time and circumstances under which Merrill's competitors were likely to withdraw their support for the market.

- 34 -

150.   Internal communications reveal that Merrill executives feared that exposure of the true condition of the auction rate securities market would cause its collapse. As a result, Merrill took steps to conceal this information from investors.

151.   As described above, Merrill published a research report on August 21, 2007 that discussed the possibility of auction failures and the lack of a "hard put" feature to the securities. Believing that the report could single-handedly undermine the auction market, Constable pressured the Research Department to retract the report.

152.   Subsequently, the chastened Research Department took pains not to publish research reports that "would give the auction a [sic] unnecessary problem: a run." As analyst Conery emphasized in an email dated January 28, 2008, "I want to make sure that research cannot be accused of causing a run on the auction desk, like was the case in August."

### CELLULAR SOUTH RELIED ON AN ASSUMPTION THAT ML ARS TRADED IN AN EFFICIENT MARKET FREE OF MANIPULATION.

153.   Cellular South, through its agents, reasonably assumed that ML ARS traded in an efficient market free of manipulation by Merrill.

154.   Before and throughout the Purchase Period, ML ARS were widely held among numerous classes of investors including individuals, small businesses, charities, and large corporate and institutional holders.

155.   The very designation of ML ARS as "auction rate" securities implied that the securities were traded on an arm's-length basis, with the auctions matching buyers with sellers and establishing a clearing rate for periodic interest or dividend payments.

156.   Auction rate securities and the auction market had existed since 1984, and had developed rapidly since that time.

- 35 -

157.   In research reports, Merrill touted the longevity and durability of auction rate securities, noting that the market for auction rate securities backed by student loans had existed "at least since the first half of the 1990s," and that auction rate preferred stock and municipal auction rate securities "have been around since the late 1980s."

158.   According to a Merrill research report published on February 4, 2008, "Closed-end auction market preferred have been around for 20 years. They have been through the S&L and banking crises of the late 1980s and early 1990s, the Asian contagion, and the 2002 accounting scandals."

159.   Merrill publicly dismissed the possibility of an auction failure, stating in a December 6, 2007 research report that "worries of a failed auction are misplaced: failed auctions are extremely rare, and investors may have an exaggerated view of their consequences."

160.   Merrill reiterated the point in a February 1, 2008 research report, published less than two weeks before Merrill withdrew its support for the auctions:

> **How often do closed-end fund auctions fail?**
> Hardly ever. There was one failed auction on January 22, 2008. But that was an isolated event that involved only a small number of shares, and the next auction from that same closed-end fund was successful; Prior to the recent episode, the last failure that involved closed end fun securities held by individual investors was in 1990.
>
> The auction failures in 1990 stemmed from the descent to insolvency of Drexel, Burnham, Lambert, who was the sole broker-dealer involved in the auctions. The fails lasted for several months until a new broker-dealer began supporting the auctions. Investors who held on did not lose money, as they received par value back when the auctions resumed with the new broker dealer.

161.   Through these and similar statements made until the collapse of the auction rate securities market, Merrill encouraged investors to believe that sufficient market demand existed to purchase the outstanding supply of ML ARS without intervention from Merrill itself that the

- 36 -

market for ML ARS was free of manipulation, and that any disclosures made by Merrill

concerning its support for ML ARS provided no basis for questioning the integrity or the fairness

of the market for ML ARS.

162.    Material news concerning ML ARS had a prompt and immediate effect on the

market price of those securities, as evidenced by, among other things, the impending "run on the

auction market" following Merrill's publication of a research report on August 21, 2007

emphasizing the lack of a "hard put" feature to ML ARS; the stabilization of the auction market

following Merrill's publication of a replacement research report on August 23, 2007 promoting

the liquidity features of ML ARS and describing those securities as short-term alternatives to

money market funds; and the immediate and permanent decline in the market price of ML ARS

following the collapse of the auction market in February 2008.

### CELLULAR SOUTH SUFFERED DAMAGE AS A RESULT OF THE IMPROPER ACTIONS OF MERRILL.

163.    As previously explained, Cellular South purchased ML ARS during the Purchase

Period.  Cellular South purchased the securities at a cost of $26,034,314.38. As to each such ML

ARS purchased by Cellular South, Merrill served as an auction dealer. In that capacity and with

respect to each ML ARS purchased by Cellular South, the Merrill engaged in the manipulative or

deceptive devices, contrivances, schemes and artifices to defraud alleged herein, including, but

not limited to, the Merrill's interventions in auctions for the ML ARS purchased by Cellular

South for the purpose and with the effect of masking the true value of such ML ARS, preventing

auction failures, setting the auction rates, and depriving Cellular South and its agents and all

other investors of the information necessary to assess the risk characteristics of ML ARS. By tits

actions, Merrill directly and proximately caused Cellular South's injuries.

- 37 -

164.    After the collapse of the ML ARS market, Cellular South tried to sell the ML ARS that it purchased.  Those attempts were unsuccessful.  Cellular South can only sell its ML ARS if it accepts a price that represents a small fraction of the cost of the securities.

165.    Although federal and state securities regulators have forced Merrill to repurchase at par value ML ARS that Merrill sold to certain of its retail investor clients and others, Cellular South continues to hold illiquid ML ARS.

166.    In its annual report for the fiscal year ended December 26, 2008, filed with the SEC on Form 10-K on February 24, 2009, Merrill Lynch admitted that the auction failures have left auction rate securities, including ML ARS, with no observable valuation methodology.

167.    In the same annual report, Merrill Lynch announced that, for the fiscal year ended December 26, 2008, it had taken a charge of $375 million (exclusive of an additional $125 million fine) in connection with Merrill's offer to repurchase ML ARS from certain investor clients made pursuant to Merrill's agreement with federal and state securities regulators. At the time Merrill Lynch recorded this charge, Merrill had repurchased ML ARS with a face value of over $3 billion. The charge recorded by Merrill Lynch constitutes an acknowledgement that ML ARS acquired by Cellular South are worth less than par value.

168.    Secondary market sales of ML ARS have occurred only at steep discounts to par value. Investors who sold their ML ARS on this secondary market have realized substantial losses.

169.    In addition, as a result of Merrill's manipulation of auctions and clearing rates for ML ARS, Cellular South has not received a rate of return equal to the auction rates applicable to each of the ML ARS that they purchased.

{00920621}

**MERRILL HAS SETTLED CLAIMS OF FRAUD BY REGULATORS
AS TO CERTAIN CLASSES OF INVESTORS.**

170.    Merrill has been the subject of various investigations and proceedings by state and

federal securities regulators and law enforcement officials for its involvement in the auction rate

securities market.

171.    The SEC first investigated Merrill's manipulation of the auction rate securities

market in 2004. On May 31, 2006, the SEC filed an Order Instituting Administrative And Cease-

And-Desist Proceedings, Making Findings, And Imposing Remedial Sanctions And A Cease-

And-Desist Order Pursuant To Section 8A Of The Securities Act Of 1933 And Section 15(b) Of

The Securities Exchange Act Of 1934, against Merrill and several other major auction rate

securities auction dealers (In The Matter Of Bear Stearns, et al., Securities Act of 1933 Release

No. 8684, Securities Exchange Act Of 1934 Release No. 53888, Administrative Proceeding File

No. 3-12310.)

172.    The SEC found that, between January 1, 2003 and June 30, 2004, Merrill and

other auction dealers willfully violated Section 17(a)(2) of the Securities Act of 1933 by

(1) intervening in auctions by bidding for their proprietary accounts or asking customers to make

or change orders to prevent failed auctions, set a "market" rate, or prevent all-hold auctions,

(2) submitting or revising auction bids after the submission deadline, (3) allocating securities

among bidders in a manner other than that which was disclosed in the prospectus, (4) providing

higher rates of return than the clearing rate to certain investors based on express or tacit

understandings with those investors, and (5) providing different price talk to certain investors,

placing those investors at an advantage in the auctions. The SEC found that Merrill's unlawful

{00920621}

conduct affected the clearing rate, and required Merrill to cease and desist and/or to make sufficient disclosures of these manipulative practices.

173.    In response to the SEC's May 31, 2006 Cease-And-Desist Order, Merrill placed on its website a document entitled, "Description of Merrill Lynch's Auction Rate Securities Practices and Procedures," that described some, but not all, of the risks associated with ML ARS.

174.    Merrill also included a vague reference to the website on the trade confirmations it sent to its investor clients after they purchased ML ARS. As a result, Merrill's clients would view an (incomplete) description of its auction rate securities practices and procedures only if they visited Merrill's website after purchasing ML ARS and saw and clicked on the appropriate link. Merrill failed to disclose its auction rate securities practices and procedures at all to investors who purchased ML ARS from distributing firms.

175.    Merrill's website disclosure was incomplete and misleading because it failed to disclose (1) that the degree of intervention Merrill needed to prevent the ML ARS resale market from collapsing was far greater than the sporadic interventions hinted at in the disclosure; (2) that Merrill followed a uniform policy of placing support bids in all auctions in which it was the sole or lead auction dealer until August 2007, when Merrill withdrew support for CDO auction rate securities, causing those auctions to fail; (3) that the market for ML ARS was under increasing stress brought on by the deteriorating credit environment; (4) that the level of support Merrill needed to provide in order to prevent auction failures was increasing as its balance sheet was weakening (thereby increasing the likelihood that Merrill would withdraw their support for the auctions and the securities would become illiquid); (5) that Merrill anticipated further liquidity problems and held an increasingly negative assessment of the continued viability of the auction rate securities market; (6) that the suppression of material facts relating to Merrill's

{00920621}

intervention in auctions resulted in the rates of interest paid on ML ARS being inadequate to compensate investors for the risk of illiquidity or to attract liquidity in the event of failed auctions; (7) that Merrill's ARS Trading Desk pressured and co-opted its purportedly independent Research Department to endorse ML ARS, while recognizing that publication of frank assessments of the auction rate securities market by the Research Department would result in its collapse; and (8) that Merrill allowed the Research Department substantial access to material nonpublic information about its inventory of ML ARS, plans to reduce that inventory, and incentives it provided to financial advisors to sell ML ARS, in violation of the prohibitions detailed in its own Auction Rate Securities Practices And Procedures.

176.   Following the collapse of the auction rate securities market in February 2008 and lawsuits filed in connection with that collapse against Merrill and other financial firms, state and federal regulators initiated new investigations into securities fraud and related claims by Merrill and other auction dealers.

177.   As described in a press release issued on August 22, 2008 by the SEC, entitled, "SEC Enforcement Division Announces Preliminary Settlement With Merrill Lynch to Help Auction Rate Securities Investors," the SEC's investigation involved alleged misrepresentations by Merrill to its clients that ML ARS "were safe, highly liquid investments equivalent to money market instruments and cash." According to the press release, the SEC contended that Merrill "did not make adequate disclosures that the liquidity of these securities was based on Merrill Lynch supporting the auctions it managed when there was not enough demand . . . . Merrill Lynch continued to tout the purported liquidity of ARS to customers despite its awareness of the escalating liquidity risks in the weeks and months preceding the collapse of the ARS market."

{00920621}

178.    On September 18, 2008, Linda Chatman Thomsen, the SEC's Director of the

Division of Enforcement, testified before Congress that Merrill and other "broker-dealer firms

that underwrote, marketed and sold auction rate securities (ARS) misled their customers."

Thomsen continued:

> Through their sales forces, marketing materials, and account
> statements, firms misrepresented to their customers that ARS were
> safe, highly liquid investments that were equivalent to cash or
> money market funds. As a result, numerous customers invested in
> ARS their savings and other finds they needed to have available on
> a short-term basis. These firms failed to disclose the increasing
> risks associated with ARS, including their reduced ability to
> support the auctions. By engaging in this conduct, *those firms
> violated the Federal securities laws, including the broker-dealer
> antifraud provisions.*

(emphasis added).

179.    Implicit in the SEC's determination is that Merrill's previous disclosures to its

investor clients concerning its auction rate securities practices and procedures, including those

published on Merrill's website beginning in August 2006, were inadequate and do not insulate

Merrill from liability.

180.    On August 21, 2008, Merrill announced that it had agreed to a settlement in

principle with federal and state regulators that permanently enjoins Merrill "from violating the

provisions of Section 15(c) of the Securities Exchange Act of 1934, and Rule 15c1-2 thereunder,

which prohibit the use of manipulative or deceptive devices by broker-dealers."

181.    The proposed regulatory settlement involves the repurchase of ML ARS only

from certain small retail investors who bought the securities from Merrill. The proposed

regulatory settlement does not provide relief to other investors who were harmed by Merrill's

manipulation of the auction rate securities market, such as Cellular South.

{00920621}

**NO SAFE HARBOR**

182.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements by Merrill identified in this complaint.

183.    The false statements referenced in this complaint were not identified as "forward-looking statements" when made.

184.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

185.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Merrill is liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by a director or an executive officer of Merrill who knew that those statements were false when made.

**LOSS CAUSATION/ECONOMIC LOSS**

186.    As alleged above, during and before the Purchase Period Merrill made misrepresentations and omissions and engaged in a comprehensive scheme and course of conduct to create, prop up, perpetuate, and manipulate for their own benefit an artificial market for ML ARS, to inflate the perceived value of ML ARS, and to generate underwriting and auction dealer fees, to the detriment of Cellular South and other investors.

187.    This comprehensive scheme and course of conduct operated as a fraud or deceit on Cellular South by, among other things, sending a false pricing signal to the market for ML

{00920621}

ARS, and creating a false impression of the supply and demand for ML ARS for the purpose of inflating the price of, and manipulating the interest rates for, those securities.

188.    The materialization of the risks concealed by Merrill was foreseeable to the Merrill throughout Purchase Period.

189.    Those risks materialized when Merrill and other auction dealers refused to continue serving as buyers of last resort for auction rate securities, including ML ARS, and the auction rate securities market collapsed.

190.    Materialization of those risks and subsequent disclosures of those risks directly and/or proximately caused the damages suffered by Cellular South.

191.    Only through the persistent conduct of Merrill and other auction dealers in artificially supporting, maintaining, and intervening in the auctions, acting as buyers of last resort, and setting the clearing rates was the market for ML ARS able to exist during the Purchase Period.

192.    The auction rate securities market depended on the voluntary, pervasive, and ongoing participation of Merrill and other auction dealers in the auctions, their manipulation of auction rates, and their acquisition of auction rate securities to keep the auctions from failing. The conduct of Merrill and other auction dealers created an illusory market that, unbeknownst to Cellular South, had a high risk of failing and leaving investors with illiquid ML ARS.

193.    During the Purchase Period, Merrill's senior management recognized that Merrill's ongoing manipulation of the auction process for ML ARS, through the submission of purchase bids designed to prevent failed auctions or set clearing rates, created excessive risk to Merrill in the form of an ever-increasing inventory of ML ARS. As a result, Merrill

- 44 -

systematically sold down its own inventory of ML ARS through an aggressive marketing campaign targeted at unsuspecting investors, such as Cellular South.

194.    Merrill failed to disclose the purpose, nature, and effect of their manipulative conduct to Cellular South and the investing public generally.

195.    It was materially deceptive for Merrill to signal to investors that ML ARS traded and were priced based on the natural interplay of supply and demand.

196.    When the auctions failed, the concealed risks that ML ARS would not trade or be priced based on the natural interplay of supply and demand materialized.

197.    Because of the Merrill's manipulation of the auction rate securities market, Cellular South suffered damage when Merrill and other auction dealers withdrew their support for the auction market.

198.    If not for the Merrill's manipulation of the market for ML ARS and their misrepresentations and omissions, Cellular South would not have purchased ML ARS.

199.    As a result of the materialization of the concealed risk that Merrill was manipulating the market for ML ARS, the true value and liquidity characteristics of ML ARS have been revealed. ML ARS remain illiquid and cannot be sold at par value on the open market. A recently developed secondary market values illiquid ML ARS at steep discounts to par value. Investors who have sold their ML ARS on this secondary market have realized substantial losses.

200.    In addition, the Merrill's comprehensive, manipulative, and deceptive conduct caused the rates on ML ARS both before and after the collapse of the auction market to be considerably lower than the rates that the market would have placed on them had the investing public been aware of the true characteristics and risks of ML ARS and the auction market.  Also,

{00920621}

certain of the ML ARS that Cellular South purchased have stopped paying the auction rate altogether.

## COUNT I

### VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THERE UNDER

201.    Cellular South reasserts each allegation set forth in the preceding paragraphs.

202.    Cellular South brings this cause of action under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5.

203.    During the Purchase Period, Merrill knew or recklessly disregarded (1) that sellers and the supply of ML ARS outstripped buyers and demand for ML ARS, (2) that this imbalance in supply and demand would lead to auction failures, and (3) that to avoid auction failures, Merrill needed to intervene to create and perpetuate the illusion of a balanced and functioning market for ML ARS.

204.    During the Purchase Period, Merrill employed manipulative or deceptive devices or contrivances, in contravention of Rule 10b-5, promulgated by the SEC, which were intended to and, before and throughout the Purchase Period, did (1) deceive the investing public, including Cellular South and its agents, (2) enable Merrill to underwrite and serve as an auction dealer for billions of dollars of ML ARS, and on which Merrill made substantial underwriting and auction dealer fees, (3) enable Merrill to sustain an artificial market for ML ARS, conceal failures of auctions for ML ARS, and conceal imbalances in the market for ML ARS, (4) enable Merrill to manipulate the auction rates for ML ARS, and (5) cause investors, such as Cellular South, to purchase overvalued ML ARS.

{00920621}

205.    Merrill employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of ML ARS, in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

206.    Merrill, directly and indirectly, engaged and participated in a comprehensive scheme and continuous course of conduct to manipulate the market for ML ARS and to defraud purchasers of those securities, as specified herein.

207.    Merrill employed manipulative or deceptive devices or contrivances, schemes and artifices to defraud.  Merrill engaged in acts, practices, and a course of conduct as alleged in this complaint in an effort to deceive investors, including Cellular South and its agents, as to the value of ML ARS by, among other things, misleading investors to believe that the prices at which they purchased ML ARS were determined by the natural interplay of supply and demand, and were not set by Merrill.

208.    Merrill's manipulative conduct was furthered by the use, means, or instrumentalities of interstate commerce and/or the mails, including but not limited to use of the wires, by Merrill personnel (1) to plan and transmit instructions for the manipulation of auctions for ML ARS, (2) to represent ML ARS as "Other Cash" in brokerage statements, thus creating the misleading impression that a non-manipulated market existed during the Purchase Period through which the securities could be readily liquidated at par value, and (3) to transmit research reports concerning ML ARS described herein.

209.    Merrill had actual knowledge of the devices, schemes, and artifices to defraud and acts, practices, and course of business which operated as a fraud and deceit upon the purchasers of ML ARS, as set forth herein, or acted with deliberate disregard of the fraudulent or deceitful nature of said conduct.

{00920621}

210.    Merrill employed the devices, schemes, and artifices to defraud and engaged in the acts, practices, and course of business described herein, knowingly or deliberately and for the purpose and effect of (1) manipulating the market for ML ARS, (2) concealing the truth about the value, liquidity, and risks of ML ARS from the investing public, including Cellular South and its agents, and (3) supporting the inflated prices and market for ML ARS.

211.    If Merrill did not have actual knowledge of the devices, schemes, and artifices to defraud and acts, practices, and course of business which operated as a fraud and deceit on the purchasers of ML ARS, it was deliberately reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover the manipulative purpose, nature, and effect of their conduct.

212.    As a result of Merrill's devices, schemes, and artifices to defraud and acts, practices, and course of business, the market prices of ML ARS failed to reflect a fair or just price of those securities and were artificially inflated during the Purchase Period.

213.    In ignorance of the fact that the market prices of ML ARS were artificially inflated, and relying directly or indirectly on an assumption of an efficient market for ML ARS free of manipulation by Merrill, Cellular South acquired overvalued ML ARS that were manipulated by Merrill during and before the Purchase Period, and were damaged thereby.

214.    At the time Merrill employed the devices, schemes, and artifices to defraud and engaged in the acts, practices, and course of business described herein, Cellular South and its agents were ignorant of Merrill's conduct, and believed ML ARS traded in an efficient market free of manipulation, at prices and with yields set by free-market influences.

215.    Had Cellular South, its agents and the marketplace known the truth regarding the value, liquidity, and risks of ML ARS, including the extent to which the market for ML ARS was

- 48 -

{00920621}

sustained by Merrill and not determined by the natural interplay of supply and demand, Cellular South would not have purchased ML ARS at all or would not have done so at the prices it paid.

216.    By virtue of the foregoing, Merrill has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated there under.

217.    As a direct and proximate result of Merrill's wrongful conduct, Cellular South suffered damages in connection with their purchases of ML ARS during the Purchase Period.

## COUNT II

### VIOLATION OF MISS. CODE ANN. § 75-71-501

218.    Cellular South reasserts each allegation set forth in the preceding paragraphs.

219.    For the reasons set forth in the paragraphs above, Merrill engaged in fraud and deceit in connection with the sale of ML ARS.  They employed devices, schemes and artifices to defraud.  They made untrue statements of material fact and/or  omitted statements of material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.  They further engaged in acts, practices and a course of business that operated as a fraud or deceit on Cellular South and the wider investing market.

220.    As a result of that fraud and deceit, Cellular South now holds illiquid ML ARS. Those ML ARS are worth only a fraction of their original cost and either do not pay an auction rate or pay a rate that is much lower than the rate that would have existed in a market free from the Merrill's manipulation.

## COUNT III

### VIOLATION OF MISS. CODE ANN. § 75-71-717(A)(2)

221.    Cellular South reasserts each allegation set forth in preceding paragraphs.

- 49 -

222.    Merrill offered and sold securities to Cellular South and other investors by use of written and oral communications, described above, that contained untrue statements of material fact or omissions necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

223.    Cellular South and its agents did not know about the falsity of the statements or the omissions when Cellular South purchased the ML ARS at issue in this complaint.

224.    Merrill cannot sustain its burden of proof that they did not know, and in the exercise of reasonable care could not have known, of the untruth and/or omissions and is, therefore, liable to Cellular South.

## COUNT IV

### BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

225.    Cellular South reasserts each allegation set forth in the preceding paragraphs .

226.    Merrill promised to sell Cellular South "very liquid" securities in the form of ML ARS.  At the time, Merrill knew that the ML ARS were not "very liquid."

227.    Cellular South paid Merrill for the ML ARS.

228.    The ML ARS that Merrill sold to Cellular South were not "very liquid."  In fact, the ML ARS that Merrill sold to Cellular South became illiquid.

229.    Cellular South suffered damages as a direct result of Merrill's breach of its contract with Cellular South.

## COUNT V

### NEGLIGENT AND/OR FRAUDULENT MISREPRESENTATIONS AND OMISSIONS

230.    Cellular South reasserts each allegation set forth in the preceding paragraphs.

- 50 -

231.    Merrill, through its employee Mr. Moore, represented to Cellular South's agent before and during the Purchase Period that ML ARS were "very liquid" securities when Merrill knew that the securities were not very liquid.

232.    At the time Cellular South's agent purchased the ML ARS from Merrill on Cellular South's behalf, Merrill omitted the following highly material facts that Merrill knew were true:

(a)    that the liquidity of ML ARS depended exclusively on Merrill's ability to continue to purchase ML ARS at auctions;

(b)    that Merrill's internal policies would soon preclude any additional purchases of ML ARS by Merrill, which would, in turn, spell the end of any viable market for ML ARS;

(c)    that Merrill's growing financial weakness would soon preclude any additional purchases of ML ARS by Merrill, which would, in turn spell the end of any viable market for ML ARS;

(d)    that Merrill was providing ever increasing financial incentives to its salespersons, such as Mr. Moore, to promote ML ARS over other investments because Merrill was holding an excessively large inventory of ML ARS that Merrill knew it must quickly sell to unsuspecting investors like Cellular South, or Merrill would become saddled with hundreds of millions of dollars of illiquid ML ARS when it became unable to continue to create the illusion of a viable ML ARS market;

(e)    that the increasing ML ARS yields seen by Cellular South's agent in the second half of 2007 were the product of a scheme by Merrill to manipulate

- 51 -

ML ARS auction rates to make ML ARS more attractive, so that Merrill could quickly reduce its own ML ARS inventory before it lost its ability to continue to create the illusion of a viable ML ARS market and became saddled with hundreds of millions of dollars of illiquid ML ARS.

233.    Cellular South, through its agent, relied on Merrill's false representations and did not know the facts omitted by Merrill that are described in the preceding paragraph.

234.    Cellular South's agent's reliance on Merrill's representations and its inability to know about Merrill's omissions were reasonable.  Cellular South and its agent could not expect for Merrill to make false representations about ML ARS and omit facts about ML ARS that Merrill knew were highly material to Cellular South's agent's decision to purchase ML ARS.

235.    Based on the Cellular South's agent's reliance on Merrill's false representations and its ignorance of the Merrill's highly material omissions, Cellular South's agent purchased ML ARS on Cellular South's behalf.

236.    Cellular South has suffered damages due to its inability to sell the ML ARS without suffering significant loss, and those damages are a direct and proximate result of Merrill's false representations and material omissions.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Cellular South seeks a judgment that provides the following relief:

(i)    an award of damages, including but not limited to rescission, other compensatory damages, consequential damages, restitution, and disgorgement of ill-gotten gains in favor of Cellular South against the defendants, jointly and severally, for injury suffered as a result of the defendants' wrongdoing, in an amount to be proven at trial, including pre and post judgment interest;

{00920621}

(ii)     an award of punitive damages against the defendants, jointly and severally;

(iii)    an award of reasonable costs and expenses incurred in this action, including

         attorneys' fees, litigation costs, and expert fees;

(iv)     an award of extraordinary, equitable, and/or injunctive relief as permitted by law,

         equity, and the federal statutory provisions applicable to this case; and

(v)      such other and further relief as the Court deems appropriate.


Dated:  February 4, 2009.

                              Respectfully submitted

                              CELLULAR SOUTH, INC.

                         By: _____
                              One of Its Attorneys

OF COUNSEL:

Charles L. McBride, Jr. (MS Bar No. 8995)
Email: cmcbride@brunini.com
Brian Kimball (MS Bar No. 100787)
Email:  bkimball@brunini.com
Brunini, Grantham, Grower &  Hewes, PLLC
The Pinnacle Building
Suite 100
190 East Capitol Street
Jackson Mississippi  39201
Telephone:  (601) 948-3101
Facsimile:   (601) 960-6902

{00920621}